Oral Argument Not Yet Scheduled

## No. 24-1151

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

### For the District of Columbia Circuit

United Steel, Paper and Forestry, Rubber,
Manufacturing, Energy, Allied Industrial and
Service Workers International Union, AFL-CIO,
*Petitioner*,

v.

Environmental Protection Agency,
*Respondent*

Olin Corporation, et al.,
*Intervenors*

Consolidated with Case Nos.
24-1182, 24-1185, 24-1202, 24-1237

## OPENING BRIEF FOR INTERVENOR OLIN CORPORATION

KEITH BRADLEY
KAYLA MARIE MENDEZ
717 17th Street, Suite 1825
Denver, CO 80202
Tel.: (303) 830-1776
Fax: (303) 894-9239
keith.bradley@squirepb.com
kayla.mendez@squirepb.com

W. CAFFEY NORMAN
ALLAN KACENJAR
2550 M Street, NW
Washington, DC 20037
Tel: (202) 457-5270
Fax: (202) 457-6315
caffey.norman@squirepb.com
allen.kacenjar@squirepb.com

KATHERINE E. WENNER
2000 Huntington Center
41 South High Street
Columbus, OH 43215
Tel.: (614) 365-2763
Fax: (614) 365-2499
katherine.wenner@squirepb.com

SQUIRE PATTON BOGGS (US) LLP

*Counsel for Olin Corporation*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Olin Corporation ("Olin") hereby certifies:

### A. Parties and Amici

All parties, intervenors and amici appearing in this Court are listed in the Opening Brief of American Chemistry Council; Texas Chemistry Council; American Fuel & Petrochemical Manufacturers; and American Petroleum Institute ("Industry Petitioners").

### 2. Ruling Under Review

This case is a challenge to the U.S. Environmental Protection Agency's final agency action titled "Procedures for Chemical Risk Evaluation Under the Toxic Substances Control Act," which appears in the Federal Register at 89 Fed. Reg. 37,028 (May 3, 2024) (the "Amended Framework Rule" or "Rule"). The Rule is codified at 40 C.F.R. Part 702, Subpart B.

### 3. Related Cases

A list of related cases appears in Industry Petitioner's Opening Brief.

**CORPORATE DISCLOSURE STATEMENT**

Under Federal Rule of Appellate Procedure and D.C. Circuit Rule 26.1, Intervenor hereby provides the following disclosures:

Olin Corporation is a publicly traded company incorporated in Virginia. BlackRock, Inc. and The Vanguard Group, Inc. each own 10% or more of the stock of Olin Corporation.

Olin Corporation produces industrial chemicals that are subject to regulation under the Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2605(a). Petitioners contend that the action under review unlawfully revised an EPA rule that affects some of the chemicals Olin manufactures; Olin has intervened in support of Industry Petitioners.

## TABLE OF CONTENTS

**Page**

JURISDICTION..................................................................................1

STATUTES AND REGULATIONS.......................................................2

ISSUES PRESENTED.........................................................................2

STATEMENT OF THE CASE..............................................................2

ARGUMENT SUMMARY....................................................................4

STANDARD OF REVIEW....................................................................6

ARGUMENT.......................................................................................8

  I.   THE WHOLE CHEMICAL APPROACH VIOLATES TSCA AND IS
     ARBITRARY AND CAPRICIOUS.............................................8

  II.  EPA CREATED AN IMPROPER REGULATORY PRESUMPTION
     AGAINST THE USE OF PERSONAL PROTECTIVE EQUIPMENT.......18

  III. EPA AUTHORIZED ITSELF TO CONSIDER POPULATION-SPECIFIC
     RISKS NOT BASED ON EXPOSURE OR SUSCEPTIBILITY.................22

CONCLUSION.....................................................................................23

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Corrosion Proof Fittings v. EPA*,
  947 F.2d 1201 (5th Cir. 1991) ................................................................2

*Encino Motorcars, LLC v. Navarro*,
  584 U.S. 79 (2018) ...............................................................................15

*Facebook, Inc. v. Duguid*,
  592 U.S. 395 (2021) .............................................................................14

\*Heating, Air Conditioning & Refrigeration Distrib. Int'l v. EPA*,
  71 F.4th 59 (D.C. Cir. 2023) ................................................................16

\*Maine Lobstermen's Ass'n v. NMFS*,
  70 F.4th 582 (D.C. Cir. 2023) ..............................................................21

*Maslenjak v. United States*,
  582 U.S. 335 (2017) .............................................................................14

\*NACS v. Bd. of Governors of Fed. Rsrv. Sys.*,
  746 F.3d 474 (D.C. Cir. 2014) ..............................................................17

*Nat'l Ass'n of Broad. v. FCC*,
  39 F.4th 817 (D.C. Cir. 2022) ..............................................................14

*Nat'l Mining Ass'n v. Babbitt*,
  172 F.3d 906 (D.C. Cir. 1999) ..............................................................20

*Nielsen v. Preap*,
  586 U.S. 392 (2019) .............................................................................10

*NLRB v. Baptist Hosp., Inc.*,
  442 U.S. 773 (1979) .............................................................................19

*U.S. Sugar Corp v. EPA*,
  113 F.4th 984 (D.C. Cir. 2024) ...............................................................7

*United Scenic Artists v. NLRB*,
762 F.2d 1027 (D.C. Cir. 1985) ........................................................... 19

*Van Buren v. United States*,
593 U.S. 374 (2021) ............................................................................. 14

*\*Vinyl Inst., Inc. v. EPA*,
106 F.4th 1118 (D.C. Cir. 2024) .................................................. 7, 20, 21

**Statutes**

5 U.S.C. § 706(2)(A) ............................................................................. 7

15 U.S.C. § 2601 ................................................................................... 1

15 U.S.C. § 2602(2)(A) ........................................................................ 10

15 U.S.C. § 2602(4) ......................................................................... 15, 18

15 U.S.C. § 2602(12) ............................................................................ 22

15 U.S.C. § 2605(a) ................................................................. 2, 3, 4, 8, 9, 10

15 U.S.C. § 2605(b)(4)(A) ........................................................ 3, 12, 13, 22

15 U.S.C. § 2605(b)(4)(B) ................................................................... 3, 7

15 U.S.C. § 2605(b)(4)(C) .................................................................. 3, 11

15 U.S.C. § 2605(b)(4)(D) ................................................................ 11, 17

15 U.S.C. § 2605(b)(4)(F) ............................................................ 3, 11, 17

15 U.S.C. § 2605(b)(4)(H) .................................................................... 11

15 U.S.C. § 2605(c)(1)(D) ...................................................................... 2

15 U.S.C. § 2605(c)(2)(A) ...................................................................... 4

15 U.S.C. § 2605(c)(2)(C) ...................................................................... 4

15 U.S.C. § 2618(c)(1) ............................................................................ 6

15 U.S.C. § 2618(c)(1)(B)(i) ................................................................... 7

15 U.S.C. § 2618(c)(1)(B)(i)(I)..................................................................7

**Other Authorities**

29 C.F.R. § 1910.132 .............................................................................18

40 C.F.R. § 702.47 ...............................................................................8, 9

82 Fed. Reg. 33,726 (July 20, 2017).....................................................4, 8, 9

88 Fed. Reg. 74,292 (Oct. 30, 2023).......................................................22

89 Fed. Reg. 37,028 (May 3, 2024) .................. 9, 12, 13, 15, 16, 18, 19, 20, 21, 22

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| EPA | Environmental Protection Agency |
| OSHA | Occupational Safety and Health Administration |
| PPE | Personal Protective Equipment |
| TSCA | Toxic Substances Control Act |

**JURISDICTION**

The Court has jurisdiction over Industry Petitioners' claims for the reasons explained in Industry Petitioners' Opening Brief.  Industry Br. 5-6, 12-15.[1]

Intervenor Olin Corporation has standing to contest the Amended Framework Rule because it manufactures chemicals that are currently undergoing risk evaluations pursuant to TSCA, 15 U.S.C. §§ 2601 *et seq.*, for which the rule being challenged constrains the outcomes and decisions EPA can make.  For example, before the Amended Framework Rule, EPA recognized that its risk-evaluation task under TSCA section 6 is to assess a given condition of use and determine whether that condition of use presents an unreasonable risk.  Now, the Amended Framework Rule confines EPA to making a single determination for a given chemical substance, applicable across all conditions of use.  This change significantly constrains how EPA evaluates risks—and potentially determines unreasonable risks—regarding important products Olin makes and sells.  As another example, the Amended Framework Rule requires a heightened degree of proof for one specific circumstance regarding use of a chemical, namely the implementation of personal protective equipment ("PPE").  PPE is an important risk-mitigation tool for many chemicals Olin manufactures.

---

[1] "Industry Br." refers to the Joint Opening Brief of Petitioners Texas Chemistry Council *et al.*, Doc. 2079425.

## STATUTES AND REGULATIONS

The addendum contains statutes pertinent to Industry Petitioners' Opening Brief.

## ISSUES PRESENTED

Olin concurs with the statement of issues presented in Industry Petitioners' Opening Brief.  Industry Br. 6-7.

## STATEMENT OF THE CASE

Before 2016, TSCA section 6(a) empowered EPA to regulate various activities with a chemical substance if EPA "finds that there is a reasonable basis to conclude that the manufacture, processing, distribution in commerce, use, or disposal of a chemical substance or mixture, or that any combination of such activities, presents or will present an unreasonable risk of injury to health or the environment."  15 U.S.C. § 2605(a) (2012).  EPA was required to select the "least burdensome requirements" and account for the "economic consequences" of its restrictions.  *Id.* §§ 2605(a), (c)(1)(D).  This authority was in place for decades, but EPA had issued only one regulation under section 6(a).  That regulation was invalidated in 1991 for multiple reasons, including that EPA rushed to prohibit use of the substance at issue in multiple circumstances without conducting the analysis needed to support that extreme step.  *Corrosion Proof Fittings v. EPA*, 947 F.2d 1201 (5th Cir. 1991).

In 2016, Congress amended TSCA in multiple respects. Now, EPA must identify a list of high-priority chemicals, and Congress also directed it to evaluate chemicals at the request of their manufacturers. 15 U.S.C. § 2605(b)(4)(C) (2016). The revised statute also mandates risk evaluations be conducted

> to determine whether a chemical substance presents an unreasonable risk of injury to health or the environment, without consideration of costs or other nonrisk factors, including an unreasonable risk to a potentially exposed or susceptible subpopulation identified as relevant to the risk evaluation by the Administrator, under the conditions of use.

*Id.* § 2605(b)(4)(A). The statute directed EPA to issue a rule establishing a process for the risk evaluations, *id.* § 2605(b)(4)(B), and to conduct the risk evaluations on those high-priority chemicals "in accordance with the rule," *id.* § 2605(b)(4)(C). The requirements included that risk evaluations "integrate and assess available information on hazards and exposures for the conditions of use of the chemical substance." *Id.* § 2605(b)(4)(F).

If EPA identifies unreasonable risks regarding a chemical, section 6(a) authorizes the agency to issue regulations "to the extent necessary so that the chemical substance ... no longer presents such risk." *Id.* § 2605(a). The potential regulations include "[a] requirement ... prohibiting or otherwise restricting the manufacturing, processing, or distribution in commerce of such substance," "[a] requirement prohibiting or otherwise regulating any manner or method of commercial use of such substance," and more. *Id.* EPA must consider the "economic

3

consequences" before adopting a section 6(a) risk-management rule.  *Id.* § 2605(c)(2)(A).  Additionally, before regulating "in a manner that substantially prevents a specific condition of use of a chemical substance," EPA must consider whether there are alternatives that "will be reasonably available as a substitute."  *Id.* § 2605(c)(2)(C).  But EPA is no longer required to strictly identify the "least burdensome" regulation.  *See id.* § 2605(a) (2016).

The 2016 amendment revised the main paragraph of section 6(a) by replacing the phrase "finds that there is a reasonable basis to conclude" with "determines in accordance with subsection (b)(4)(A)."  *Compare* 15 U.S.C. § 2605(a) (2018) *with* 15 U.S.C. § 2605(a) (2012).

In accordance with the statutory deadline, EPA issued the Framework Rule governing risk evaluations in July 2017.  82 Fed. Reg. 33,726 (July 20, 2017) ("Original Framework Rule").  In 2024 it issued significant revisions to the rule, which constitute the Amended Framework Rule under challenge.  Many of these changes are contrary to TSCA and/or arbitrary and capricious.

## ARGUMENT SUMMARY

EPA's Amended Framework Rule asserts expansive authority beyond what the statute permits, while EPA simultaneously chose selective compliance with prescriptions that are explicit in the statute.

4

One significant change, compared to the Original Framework Rule, is that EPA will now perform a single risk determination for a given chemical, concluding that the chemical does or does not present an unreasonable risk, rather than making determinations specific to the applications and activities that people engage in with the chemical.  This violates TSCA, because the statute mandates precisely the activity-specific determinations EPA now refuses to conduct.

Section 6(a) authorizes EPA to regulate activities with a chemical if it determines that "manufacture," "processing," "use," etc., of the chemical "presents unreasonable risks."  An ordinary-English reading of the language and grammatical structure leave no doubt that the activities, not the chemical, must present the unreasonable risks.  The purpose of risk evaluations is to generate a determination of either unreasonable risk or reasonable risk activity.  EPA ignored this text, instead rewriting the Rule to generate its conclusion that the determination *does not matter* for the regulation's scope.

EPA relied also on the phrase "under the conditions of use," in section 6(b)(4)(A), which restricts how EPA must conduct risk evaluations.  EPA perversely interpreted that restriction as an expansion of EPA's authority, letting EPA regulate all activities with a chemical if any condition of use generates an unreasonable risk.  That reading is contrary to the ordinary English of the provision. It also assumes Congress significantly expanded the reach of TSCA regulation.  This

5

is an absurd result given that Congress left unaltered most of the language of section 6(a).  EPA's approach is contrary to the normal methods of statutory interpretation.

Meanwhile, EPA ignored what Congress actually prescribed through the "conditions of use" phrase.  The statute mandates that EPA evaluate the risks from using a chemical under the actual circumstances of use as "intended, known, or reasonably foreseen."  The use of PPE is a particularly crucial circumstance, and one easily foreseen whenever regulations of the Occupational Safety and Health Administration ("OSHA") require such use.  Under the Amended Framework Rule, EPA refuses to account for how PPE reduces exposures and hazards, unless the record shows definitively that PPE is in use and fully effective.  According to EPA, this one circumstance must be "known," rather than "reasonably foreseen," amounting to a presumption that PPE is ineffective or not in use, without citing any evidence that the presumption is consistent with reality in OSHA-regulated workplaces.

**STANDARD OF REVIEW**

As noted by Industry Petitioners, the standard set forth in the Administrative Procedure Act ("APA") applies to the Court's review of the Amended Framework Rule.  15 U.S.C. § 2618(c)(1).  Courts must set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

6

law." 5 U.S.C. § 706(2)(A).  However, for any rule under certain portions of TSCA, including section 6(b)(4), "the court shall hold unlawful and set aside such rule if the court finds that the rule is not supported by substantial evidence in the rulemaking record taken as a whole."  15 U.S.C. § 2618(c)(1)(B)(i)(I).  This Court has held this "should be viewed as a distinct standard" that is "*stricter* than its APA counterpart."  *Vinyl Inst., Inc. v. EPA*, 106 F.4th 1118, 1125 (D.C. Cir. 2024).  This standard applies, as specified under section 19(c)(1)(B)(I) of TSCA, to all rules "under section[s] 2603(a), 2604(b)(4), 2605(a)."  *Vinyl Institute* applied the more rigorous standard to review an EPA order requiring a manufacturer to conduct additional testing of a product, holding that, for example, EPA "must provide substantial evidence of the need for new information."  *Id.* at 1128.  The Amended Framework Rule was issued under and as implementation of section 6(b)(4)(B), 15 U.S.C. § 2605(b)(4)(B), and is therefore subject to the "stricter" review standard, *id.* § 2618(c)(1)(B)(i).

"To determine whether an agency has acted within its statutory authority," the Court must utilize "traditional tools of statutory interpretation" and apply the "best" reading of the statute without giving deference to the agency's interpretation.  *U.S. Sugar Corp v. EPA,* 113 F.4th 984, 991, 997 (D.C. Cir. 2024) (citing *Loper Bright Enters. v. Raimondo,* 144 S. Ct. 2244, 2266 (2024)).

**ARGUMENT**

Olin agrees with and adopts the arguments presented by Industry Petitioners. Consistent with Circuit Rule 28(d)(2), Olin focuses its brief on additional arguments demonstrating EPA's grave errors in the Amended Framework Rule.

## I.  THE WHOLE CHEMICAL APPROACH VIOLATES TSCA AND IS ARBITRARY AND CAPRICIOUS.

TSCA section 6(a) is a heavy-duty regulatory weapon, empowering EPA to prohibit manufacturing or sales of a chemical; to limit the amount that can be manufactured or sold; to prohibit "or otherwise regulat[e] any manner or method of commercial use" of the substance; and more, "to the extent necessary" to address an unreasonable risk EPA has identified.   15 U.S.C. § 2605(a).   That predicate determination of an unreasonable risk is critical.   It unlocks the authority of section 6(a) and drives the scope of regulation, given that EPA is to take measures "to the extent necessary" to prevent the identified risk.  *Id.*

The Original Framework Rule said that EPA "will determine whether the chemical substance presents an unreasonable risk … under each condition of uses [sic] within the scope of the risk evaluation."  82 Fed. Reg. at 33,752 (codified at 40 C.F.R. § 702.47 (2017)).   EPA stated it would "make *individual risk determinations* for all uses identified in the scope," and it also "clarif[ied]" that "each condition of use covered by the risk evaluation" will "receive[] a risk determination."  *Id.* at 33,744 (emphasis added).  "Any rule" under section 6(a), EPA

8

continued, "would apply only to the condition(s) of use that present an unreasonable risk, and those that do not present an unreasonable risk will not be subject to risk management." *Id.*

The Amended Framework Rule removed section 702.47, which had specified EPA would determine risk for each condition of use. EPA now insists it will make a "single risk determination" for a chemical substance as a whole, not individual determinations for each use. 89 Fed. Reg. at 37,035. Moreover, when commenters objected that this change would result in overly broad 6(a) regulations, EPA did not reiterate its previous commitment that uses not themselves presenting unreasonable risk will not be subject to 6(a) regulations. Instead, EPA said "[t]he determination itself ... has no bearing on which conditions of use EPA will focus on during the risk management phase." *Id.* at 37,036.

That statement contravenes section 6(a). EPA's authority to regulate under that subsection is *entirely dependent* on the determination. As Congress stated: "If [EPA] determines ... that the manufacture [etc.] of a chemical substance ... presents an unreasonable risk, ... [EPA] shall by rule ... apply one or more of the following requirements to such substance ... to the extent necessary" to mitigate "such risk." 15 U.S.C. § 2605(a). Whether EPA can regulate depends on what determination it made, and the only regulations permissible are those "to the extent necessary" depending on "such risk," *i.e.*, the risk EPA has determined.

9

EPA's insistence on a single up-or-down determination for a given chemical is also contrary to TSCA. Section 6(a) calls for determinations that "the manufacture, processing, distribution in commerce, use, or disposal of a chemical substance ... presents an unreasonable risk." 15 U.S.C. § 2605(a). "Presents," here, takes as its subject "manufacture" and the other verbal nouns. In ordinary English one would never say "dropping a book presents a risk of an injured foot," and mean that the book itself presents the risk. "Dropping" is a verbal noun, completed by the object of that action; in section 6(a), the "manufacture" or "use" or "disposal" of the chemical is the noun that "presents" the risk. "[W]ords are to be given the meaning that proper grammar and usage would assign them, ... and the rules of grammar govern statutory interpretation." *Nielsen v. Preap*, 586 U.S. 392, 407-08 (2019).

That structure is also consistent with common sense. A chemical substance is a concept—a "substance of a particular molecular identity," 15 U.S.C. § 2602(2)(A)—as well as a physical material that exists in various places. For example, trichloroethylene, a substance for which EPA is currently considering a section 6(a) rule, means any material having the chemical formula $C_2HCl_3$. The molecular formula does not present risks in the abstract, nor does the physical material. Risk, if it arises, comes from activities involving a substance, such as using it as a cleaner; transporting, storing, or carrying out chemical reactions with it; etc. The key section 6(a) language aligns with that common-sense view.

10

That formulation has been unchanged in the statute since its enactment. In 2016, Congress only replaced "finds that there is a reasonable basis to conclude" with a reference to making the determination "in accordance with" subsection (b)(4)(A). That change is an added limitation on—not an expansion of—EPA's authority. Instead of having whatever flexibility was available under the original statute to "reasonably conclude," EPA must comply with the (b)(4)(A) restrictions to earn 6(a) authority for a chemical. For example, EPA cannot simply choose what chemicals to evaluate. Instead, it must evaluate a chemical if requested by the manufacturer, if the chemical was on a list of 10 already-prioritized chemicals that EPA was required to publish by the end of 2016, or if the chemical receives prioritization under a specific prioritization process set forth by statute. 15 U.S.C. § 2605(b)(4)(C) (cross-referencing paragraphs (2)(A) and (1)(B)(i)). At the outset of a risk evaluation, EPA must "publish the scope of the risk evaluation to be conducted." *Id.* § 2605(b)(4)(D). "In conducting a risk evaluation," EPA must "integrate and assess available information" and "describe the weight of the scientific evidence for the identified hazard and exposure." *Id.* § 2605(b)(4)(F). And EPA must provide a comment period of at least 30 days on a draft risk evaluation. *Id.* § 2605(b)(4)(H). Given these procedural and substantive requirements for a determination to be "in accordance with subsection (b)(4)(A)," that new prerequisite in subsection (a) is clearly a limitation.

11

Instead, EPA took the reference to subsection (b)(4)(A) as license to turn the statute on its head.  EPA's explanation of why it thought a single, whole-chemical risk determination is appropriate only discusses subsection (b)(4)(A) and does not mention subsection (a).  Yet subsection (a) is the provision that gives legal consequence to a determination finding an unreasonable risk; authorizes the determinations; and establishes the purpose and meaning of determinations.  EPA addressed this critical provision only once in its justification of the whole-chemical approach, and that was to interpret subsection (a) as immaterial:  "The basis for EPA to determine the extent of necessary regulation in [section 6(a)] comes from the entirety of the risk evaluation—not simply the risk determination."  89 Fed. Reg. at 37,036.  That statement is the opposite of what section 6(a) says.  Strikingly, in making the statement, EPA omitted key words from section 6(a).[2]

Having elevated subsection (b)(4)(A) above subsection (a), contrary to the Congressional text, EPA then turned subsection (b)(4)(A) upside down.  The text says EPA is to "conduct risk evaluations ... to determine whether a chemical substance presents an unreasonable risk ... under the conditions of use."  15 U.S.C.

_____

[2] The Rule quotes section 6(a) as saying EPA regulates only "to the extent necessary so that the chemical substance or mixture no longer presents [unreasonable] risk." 89 Fed. Reg. at 37,036 (alteration in original).  Actually, subsection (a) says "no longer presents such risk."  "Such risk" refers to the "determin[ation]" of "risk" invoked in the first part of the sentence in subsection (a).  Only by eliminating that reference could EPA pretend the determination does not matter to the section 6(a) authority.

§ 2605(b)(4)(A).  That provision nowhere states each chemical should receive a single determination.  The text points in the opposite direction.  It refers to "chemical substance" in the singular, and directs EPA to "conduct risk evaluations," plural, about a given chemical substance to determine whether the substance "presents an unreasonable risk ... under the conditions of use."  *Id.*  The natural interpretation of the parallel structure is that, for a given substance, the various conditions of use receive different evaluations.  Each evaluation, for its given condition of use, would lead to its own "determination" as required by section 6(a).  This grammar aligns with the structure of subsection 6(a).  Had Congress meant that each chemical substance gets only a single determination—preceded, presumably by a single evaluation—it more naturally could have called for a singular "risk evaluation" about "a chemical substance."

Yet EPA inferred the supposed mandate for single, whole-chemical determinations from the phrase "under the conditions of use."  *See* 89 Fed. Reg. at 37,035.  This, too, is an unnatural reading.  The statute says EPA is to evaluate whether a chemical presents risk "under the conditions of use."   15 U.S.C. § 2605(b)(4)(A).  That critical qualification is an adverbial phrase which modifies "presents an unreasonable risk."  (That phrase is followed by a comma, which introduces two different modifiers, and then another comma precedes "under the conditions" so that this phrase is attached to "presents an unreasonable risk.")  A

13

"qualifying phrase separated from antecedents by a comma is evidence that the qualifier is supposed to apply to all the antecedents." *Facebook, Inc. v. Duguid*, 592 U.S. 395, 403 (2021). A "qualifying phrase" limits the concept it modifies. For example, in *Maslenjak v. United States*, the Supreme Court observed that "[t]he adverbial phrase 'contrary to law,' wedged in between 'procure' and 'naturalization,'" in an immigration statute, "specifies *how* a person must procure naturalization so as to run afoul of the statute." 582 U.S. 335, 341-42 (2017). In *Van Buren v. United States*, the Supreme Court observed that "the modifying phrase 'so to obtain,'" in a different statute, "directs the reader to consider a specific limitation." 593 U.S. 374, 386 (2021). In *Nat'l Ass'n of Broad. v. FCC*, this Court held that a phrase requiring a broadcaster to "exercise reasonable diligence to obtain from its employees" certain information meant there was no obligation of "diligent effort to obtain the information from any *possible* source"; limiting the scope to obtaining from employees (and from another category separately mentioned) was the purpose of the qualifying phrase. 39 F.4th 817, 819-20 (D.C. Cir. 2022). Similarly, here, the ordinary English function of "under the conditions of use," as a modifier of "presents unreasonable risk," limits the evaluations to the risks presented "under the conditions of use."

"Conditions of use," in turn, is defined to mean "the circumstances ... under which a chemical substance is ... manufactured, processed, distributed in commerce,

14

used, or disposed of." 15 U.S.C. § 2602(4). The qualification that risk evaluations must assess the risks presented "under the conditions of use" points to the same kind of analysis called for by section 6(a): whether the activities in which people engage with the chemical present unreasonable risks.

Contrary to that common-sense, ordinary-English interpretation, EPA insists the phrase "conditions of use" meant Congress wants EPA to make a singular evaluation for all activities involving a chemical. Because the statute refers to "conditions of use," plural, EPA concluded it must address all the conditions of use in a single determination. 89 Fed. Reg. at 37,035.

EPA's interpretive analysis is deeply flawed. As noted above, the text requires multiple evaluations for a given chemical; EPA did not account for that important feature. Moreover, the "conditions of use" definition does not mandate consideration of all activities at once. The definition refers to circumstances in which a chemical is "manufactured, processed, distributed in commerce, used, *or* disposed of." 15 U.S.C. § 2602(4). The word "or" is "almost always disjunctive." *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 87 (2018). Thus, Congress was surely not specifying that the "conditions of use" must encompass all circumstances from manufacture through disposal; that definition would have needed the word "and." "Conditions of use" can, in a given evaluation, refer to the circumstances of a use, *or* of a manufacture, etc. In short, it is quite proper, under the statutory text,

15

for EPA to perform a risk evaluation for a particular condition of use, meaning the circumstances of a particular activity of manufacturing, processing, use, etc.; and for EPA to determine the chemical presents an unreasonable risk *under that condition of use*. This outcome aligns with the determination authorized by section 6(a) that the particular activity of manufacturing, processing, use, etc., presents an unreasonable risk.

In concluding the contrary, EPA asserted its preferred view is "align[ed] ... with the statutory text and structure," 89 Fed. Reg. at 37,035, but did not address the actual text and structure. EPA strangely took Congress's added limitations—in subsection (a) and subsection (b)(4)(A)—as expansions of EPA's authority. Pre-existing subsection (a) authorized determinations only on an activity-by-activity basis. If Congress intended the 2016 amendments to authorize a single determination for each chemical, the phrase "under the conditions of use" was not the means to communicate that change. "Congress ... does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions." *Heating, Air Conditioning & Refrigeration Distrib. Int'l v. EPA*, 71 F.4th 59, 67 (D.C. Cir. 2023) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)). It is particularly "implausible that Congress engaged in a high-stakes game of hide-and-seek" by "writing a provision that seems to require one thing but embedding a

substantially different … requirement in the statute's definitions section." *NACS v. Bd. of Governors of Fed. Rsrv. Sys.*, 746 F.3d 474, 494 (D.C. Cir. 2014).

Multiple TSCA provisions confirm that risk determinations are to be made on an activity-by-activity basis. Industry Petitioners discuss some of these, Industry Br. 28-31, but there are other examples too. For example, upon starting a risk evaluation, EPA must "publish the scope of the risk evaluation to be conducted, including the hazards, exposures, conditions of use, and the potentially exposed or susceptible subpopulations the Administrator expects to consider." 15 U.S.C. § 2605(b)(4)(D). On EPA's reading, this publication is barely necessary, because every evaluation's scope is "the whole chemical"; and the conditions of use to be considered include "all of them," on every occasion, because (says EPA) Congress mandated a single determination for each chemical. To the contrary, consistent with the notion above that EPA can conduct multiple evaluations for a given chemical, by requiring EPA to identify the hazards and conditions of use to be considered in a given evaluation Congress signaled that EPA is to set the scope for that evaluation, including by choosing which conditions of use to address. "In conducting a risk evaluation, ... EPA shall ... describe the weight of the scientific evidence for the identified hazard and exposure." 15 U.S.C. § 2605(b)(4)(F). That text indicates a risk evaluation considers a particular activity with a given chemical, because that is a prerequisite for "identif[ying]" a particular "exposure."

## II.  EPA CREATED AN IMPROPER REGULATORY PRESUMPTION AGAINST THE USE OF PERSONAL PROTECTIVE EQUIPMENT.

The Amended Framework Rule also violates TSCA by relegating PPE to a secondary class of conditions of use.  Workers routinely use PPE of various kinds, such as respirators that prevent vapors from reaching the wearer's mouth, nose, and lungs; gloves, aprons, or outerwear to prevent skin contact; and safety glasses preventing contact of the chemical with a wearer's eyes.  In many situations and for many chemicals, employers provide and workers use PPE, in part because OSHA regulations require an employer to provide appropriate PPE and verify its use. 29 C.F.R. § 1910.132.  PPE use is obviously a "circumstance" in which a chemical is manufactured, processed, used, or disposed of.  The definition of "conditions of use" includes such circumstances that are "intended, known, or reasonably foreseen."  15 U.S.C. § 2602(4).  A workplace practice required by law and subject to significant enforcement penalties under the Occupational Safety and Health Act is "reasonably foreseen."  And EPA presented no evidence to the contrary.

Inexplicably, EPA's Amended Framework Rule singled out PPE as the one condition of use for which it refused to account.  "EPA will not consider exposure reduction based on assumed use of personal protective equipment as part of the risk determination."  89 Fed. Reg. at 37,055 (to be codified at 40 C.F.R. § 702.41(f)(2)). That refusal violates the statute.  Per statutory definition, a circumstance need not be "known" for it to count in a risk evaluation.  It is enough to be "reasonably foreseen."

18

An "assumed use" that is consistent with regulatory requirements is surely a use that can be "reasonably foreseen." Yet EPA insisted that for this one potential circumstance, unlike all others, "reasonably foreseen" is not enough. Congress's definition of "conditions of use" does not permit EPA to selectively choose the circumstances it does not want to include.

EPA insisted it would consider evidence that PPE is in use in a given activity, and that the PPE is effective. But EPA's hypothetical illustration was that "performance of a condition of use is impossible in the absence of PPE." 89 Fed. Reg. at 37,037. That hypothetical demonstrates how significantly EPA shifted the burden, and the presumption, on the use of PPE. It is no longer enough to know that an industry is regulatorily required to provide and use PPE. Now, users must prove to EPA that it would be *impossible* to do their work without PPE.

A regulatory presumption of this type—EPA "will not consider" the risk reduction from PPE usage unless it receives affirmative evidence proving the prevalence of actual use, and effectiveness, of the PPE—"must rest on a sound factual connection between the proved and inferred facts." *NLRB v. Baptist Hosp., Inc.*, 442 U.S. 773, 787 (1979). "[A]n agency is not free to ignore statutory language by creating a presumption on grounds of policy to avoid the necessity for finding that which the legislature requires to be found." *United Scenic Artists v. NLRB*, 762 F.2d 1027, 1034 (D.C. Cir. 1985). For an agency's presumption to be

19

legitimate, "the circumstances giving rise to the presumption must make it more likely than not that the presumed fact exists." *Nat'l Mining Ass'n v. Babbitt*, 172 F.3d 906, 910 (D.C. Cir. 1999).

EPA's denigration of PPE fails that test under the ordinary APA standard of review and even more obviously fails given the stricter review that Congress specified for TSCA rules. EPA had no such evidence. It speculated that "workers may be highly exposed because they are not covered by [OSHA] standards, their employers are out of compliance with OSHA standards, the PPE is not sufficient to address the risk from the chemical, or their PPE does not fit or function properly." 89 Fed. Reg. at 37,037. The first of these hypotheses, that the users of the chemical might not be covered by pertinent OSHA standards, is easily addressed for any given usage. That a category of employers might fall outside OSHA standards cannot justify ignoring PPE usage among those employers who are covered. The second and fourth hypotheses are merely unsupported speculation that employers might be violating OSHA standards. *Vinyl Institute* held that EPA must have substantial evidence to demand more information about a chemical, 106 F.4th at 1127-28; likewise, EPA must have substantial evidence that employers are violating OSHA regulations before EPA can validly presume the violation. Finally, EPA's third hypothesis, that PPE "is not sufficient to address the risk from the chemical," is a conclusion that needs to be based on substantial evidence, not a breezy assumption

20

conjured up to impose massively burdensome new regulations. Even if PPE does not address risks as far as EPA might prefer, PPE unquestionably reduces exposures. That PPE might, in some circumstances, be only a partial mitigation cannot justify refusing to account for it at all. Yet that is what EPA insists it will do: "EPA will not consider exposure reduction" from PPE. 89 Fed. Reg. at 37,055.

Last year, this Court rejected a policy-based presumption from the National Marine Fisheries Service. That agency's policy was to use the more conservative— *i.e.*, more wildlife-protective—outcome of any range of modeling scenarios. *Maine Lobstermen's Ass'n v. NMFS*, 70 F.4th 582, 598-99 (D.C. Cir. 2023). "Statutory text and structure do not authorize the Service to 'generally select the value that would lead to conclusions of higher, rather than lower, risk,'" the Court explained, because "[t]he statute is focused upon 'likely' outcomes, not worst-case scenarios." *Id.* at 599. So too here: TSCA requires EPA to consider the circumstances "reasonably foreseen" in use. As *Maine Lobstermen's* continued, the statute at issue "requires the Service to use the best available scientific data, not the most pessimistic." *Id.* TSCA is the same. *Maine Lobstermen's* rejected the Service's strategy of determining policy "by merely presuming that unavailable data, if only they could be produced, would weigh against" one side of the question. *Id.* at 599. TSCA requires an even stricter standard of substantial evidence than the Fisheries Service faced, *see Vinyl Inst.*, 106 F.4th at 1125; yet EPA adopted the same sort of

21

presumption.  Speculation that some workers "may be" outside OSHA regulations or some employers "may be" noncompliant is not substantial evidence; it is not evidence at all.

## III. EPA AUTHORIZED ITSELF TO CONSIDER POPULATION-SPECIFIC RISKS NOT BASED ON EXPOSURE OR SUSCEPTIBILITY.

TSCA, as revised in 2016, allowed EPA to consider, in a risk evaluation, the possibility of unreasonable risk "to a potentially exposed or susceptible subpopulation."   15 U.S.C. § 2605(b)(4)(A).   Congress gave examples of such subpopulations: "infants, children, pregnant women, workers, or the elderly."  *Id.* § 2602(12).  EPA's rule adds another: "overburdened communities."  89 Fed. Reg. at 37,052 (to be codified at 40 C.F.R. § 702.33).  This term includes "communities that may be disproportionately exposed or impacted by environmental harms." 88 Fed. Reg. 74,292, 74,306 (Oct. 30, 2023).  Thus, the category of "overburdened communities" includes communities that are not "potentially exposed" to the chemical at issue, and are not particularly "susceptible" to hazard, but instead have been "disproportionately ... impacted by environmental harms" in general.  That impact can result, in EPA's concept, from "lack of opportunity for public participation."  *Id.*  While that lack of opportunity is surely an important concern, TSCA section 6(b)(4)(A) is not an authorized mechanism for addressing it.  EPA is supposed to consider risks for subpopulations that are "potentially exposed or

susceptible" to the hazard being studied.  Populations that do not meet that standard, but instead have broader health concerns arising for other reasons, cannot be a factor.

## CONCLUSION

Olin agrees with Industry Petitioners that the Amended Framework Rule must be vacated.

*/s/ Keith Bradley*
Keith Bradley
Kayla Marie Mendez
717 17th Street, Suite 1825
Denver, CO 80202
Tel: (303) 830-1776
Fax: (303) 894-9239
keith.bradley@squirepb.com
kayla.mendez@squirepb.com

W. Caffey Norman
Allan Kacenjar
2550 M Street, NW
Washington, DC 20037
Tel: (202) 457-5270
Fax: (202) 457-6315
caffey.norman@squirepb.com
allen.kacenjar@squirepb.com

Katherine E. Wenner
2000 Huntington Center
41 South High Street
Columbus, OH 43215
Tel.: (614) 365-2763
Fax: (614) 365-2499
katherine.wenner@squirepb.com

SQUIRE PATTON BOGGS (US) LLP
*Counsel for Olin Corporation*

October 17, 2024

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limit of the Court's briefing order because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure P. 32(f) and Circuit Rule 32(e)(1), this document contains no more than 5,195 words, as determined by the word-count function of Microsoft Word 2016.

This document further complies with the typeface requirements of Federal Rule of Appellate Procedure P. 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman Font.

*/s/ Keith Bradley*
Keith Bradley